**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

BETTY J. CRENSHAW and RAYMOND E.          )
CRENSHAW, SR.,                            )
     Plaintiffs,                         )
                                     )
     v.                                  )     CAUSE NO.: 2:05-CV-440-PRC
                                       )
CITY OF EAST CHICAGO, INDIANA, et al.,    )
     Defendants.                         )

**OPINION AND ORDER**

This matter is before the Court on Defendant Citizens Financial Bank's Motion for Summary

Judgment [DE 52], filed on January 9, 2008; and Defendants' City of East Chicago, Indiana,

Officers Jose Rivera, James Blackwell, Jake Zygmontowski, and Lt. William Snyder, Individually

and as Officers of the East Chicago, Indiana Police Department Motion for Summary Judgment [DE

58], filed on February 8, 2008.  On February 22, 2008, Plaintiffs filed a Plaintiffs' Response to

Defendant Citizens Financial Bank's Motion for Summary Judgment; and on March 4, 2008,

Citizens Financial Bank ("CFB") filed a Defendant's Reply in Support of its Motion for Summary

Judgment.  On March 31, 2008, Plaintiffs filed a Plaintiffs' Response to East Chicago Defendants'

Motion for Summary Judgment; and on May 16, 2008, the City of East Chicago, Indiana, and

Officers Jose Rivera, James Blackwell, Jake Zygmontowski, and Lt. William Snyder (collectively,

"City of East Chicago Defendants") filed a Reply Brief in Support of Defendants' City of East

Chicago, Jose Rivera, James Blackwell, Jake Zygmontowski, and William Snyder's Motion for

Summary Judgment.

Defendants' Motions concern a single factual occurrence and implicate overlapping factual

and legal issues.  Both Motions are addressed in this Opinion and Order.  For the following reasons,

the Court grants Defendant CFB's Motion for Summary Judgment and grants in part and denies in part the City of East Chicago Defendants' Motion for Summary Judgment.

## PROCEDURAL BACKGROUND

On December 6, 2005, Plaintiffs Betty J. Crenshaw ("Betty") and Raymond E. Crenshaw, Sr. ("Raymond") filed a Complaint against CFB and the City of East Chicago Defendants seeking monetary damages for alleged violations of their rights under 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and under the laws of the State of Indiana.  Plaintiffs assert that this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 to hear their federal claims, and pendent subject matter jurisdiction pursuant to 28 U.S.C. § 1343 to hear their tort claims arising under Indiana state law.

On February 14, 2006, CFB filed an Answer to Complaint and Affirmative Defenses.  On February 17, 2006, the City of East Chicago Defendants filed an Answer to Complaint.

On January 9, 2008, CFB filed its Motion for Summary Judgment, and on February 8, 2008, the East Chicago Defendants filed their Motion for Summary Judgment.  Defendants collectively contend that no material issues of fact exist and request that the Court grant summary judgment in their favor as to all of Plaintiffs' claims.  The Motions are now fully briefed and before the Court.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND

On February 6, 2004, at approximately 5:00 p.m., Betty entered the premises of a CFB branch in East Chicago, Indiana, to transact business at the walk-up teller counter. At that same time and place, CFB employed Jose Rivera as a bank security guard. The City of East Chicago also employed Rivera as a full-time, duly appointed and acting officer of the East Chicago Police Department ("ECPD").

Betty made a savings account deposit at the teller counter and continued to transact business with a bank teller. Betty asked the teller to provide her ATM pin number. The teller informed Betty that she would have to pay a fee in order to obtain her ATM pin number. Betty said that the fee was not fair and questioned why she should have to pay. Supervising teller, Teresa Quezada, who was present during the incident, contends that Betty then swore and said she would not pay any money. Betty contends that she never raised her voice and never swore.

At this point, at approximately 5:08 p.m., Officer Rivera approached Betty and asked her to lower her voice. Officer Rivera told Betty that if she refused to lower her voice, he would throw her out or ask her to leave. Betty turned back to the tellers and continued her discussion, at which point Officer Rivera informed Betty that he was going to arrest her. Betty replied "go ahead" or something similar. CFB's Br. Summ. J., Ex. D, at 9. Ms. Quezada and bank teller Laura DelaPaz contend that Betty repeatedly told Officer Rivera to arrest her. Officer Rivera then handcuffed Betty at the teller window.

An arrest report completed by Officer Rivera describes Betty yelling and arguing with a bank teller, refusing to calm down or listen to the teller, and being continuously boisterous, which

3

disrupted the business.  The report provides that Officer Rivera arrested Betty for disorderly conduct after Betty stated that she would not leave the bank unless she was under arrest.

At the time of the arrest, Officer Rivera wore a "full police uniform and his duty jacket with the word 'POLICE' emblazoned on the back in large letters."  CFB's Br. Summ. J., Ex. B., at 2. Officer Rivera also wore a gun holster and a patch on his uniform indicating that he was a police officer.  According to his arrest report, Officer Rivera arrested Betty at 5:15 p.m.

After placing her in handcuffs, Officer Rivera moved Betty from the teller counter toward a chair in the lobby and asked her to sit down.  Betty stated that she could not sit down because she had a bad leg.  Betty alleges that Officer Rivera then used his "left knee to kick her right leg from the side at the knee" causing her to buckle and collapse onto the chair.  *Id*. at 2.  Officer Rivera characterized the take down as guiding Betty onto the chair.

Meanwhile, outside the bank Betty's husband, Raymond, was loading groceries into the couple's car.  Raymond looked through a bank window and saw his wife in handcuffs.  Raymond entered the CFB lobby and approached Officer Rivera, asking that Officer Rivera not touch his wife. Officer Rivera contends that while inside the bank, Raymond yelled and used profanity.  Officer Rivera asked Raymond to leave the bank, which he did.  Officer Rivera contends that Raymond continued to yell and use profanity outside the bank.  Raymond concedes that he was excited but does not recall raising his voice and denies cursing.  Subsequently, Officers Jake Zygmontowski and James Blackwell, who according to Plaintiffs aided Officer Rivera, arrested Raymond for disorderly conduct.  Officer Rivera's arrest report relates that Raymond said that he would have any charges brought against he and Betty dropped because Betty's brother is Bernard Carter, the Lake County Prosecutor.

Betty and Raymond were then transported to the ECPD police station where they were booked and detained. Following booking, personnel at the station called an ambulance and arranged for Betty to be transported to a hospital to receive care for her complaints of leg pain. Betty arrived at St. Catherine Hospital emergency room at 7:37 p.m. Raymond remained at the police station until Betty's sister arrived and posted bail.

## STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. The

moving party may discharge its "initial responsibility" by simply "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *See id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party, if it chooses, may support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *See Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. *See* Fed. R. Civ. P. 56(e)(2); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Rule 56(e) establishes that the opposing party's "response must–by affidavits or as otherwise provided in this rule–set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor

of that party. *See NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *See Anderson*, 477 U.S. at 249-50; *Doe*, 42 F.3d at 443.

### ANALYSIS OF CFB'S MOTION FOR SUMMARY JUDGMENT

CFB argues that during the actions complained of by Plaintiffs, Officer Rivera acted in his role as a police officer, and that it, as a private employer, cannot be held liable for those acts. In the alternative, CFB argues that if Officer Rivera did act as an employee of CFB when arresting Betty and Raymond, he acted outside the scope of his employment, and thus Plaintiffs cannot establish respondeat superior liability. With respect to liability under 42 U.S.C. § 1983, CFB contends that Plaintiffs failed to show that it acted under color of state law or was the cause of any deprivation of constitutional rights. Plaintiffs argue that CFB is vicariously liable for the actions of Officer Rivera and is also liable for Officer Rivera's actions pursuant to 42 U.S.C. § 1983.

### A. Tort liability

CFB contends that Officer Rivera acted as a City of East Chicago police officer when he arrested and detained Betty and Raymond and that it cannot be held liable for his police conduct. CFB relies on a line of Indiana state court case law to support its argument. Plaintiffs submit their own precedent in response. A thorough examination of all relevant Indiana law is necessary to resolve this issue. Examining these, Plaintiffs' state law claims, the Court interprets Indiana law.

"A federal court interpreting state law must predict how the state's highest court would act and then rule accordingly." *See Heidelbert v. Ill. Prisoner Review Bd.*, 163 F.3d 1025, 1027 (7th Cir. 1998).

In *Sports, Inc. v. Gilbert*, the first case CFB relies on, a suspected drunk driver drove into another vehicle. 431 N.E.2d 534 (Ind. Ct. App. 1982), *reh'g denied*. The passengers of the second vehicle sued a third-party owner of an automobile racetrack, alleging that the owner negligently allowed the suspected drunk driver to leave the racetrack. The racetrack employed a security force consisting of off-duty police officers and special deputies. Before colliding with the plaintiff passengers, the suspected drunk driver had a minor collision while driving in the racetrack parking lot, and security officers responding to the scene suspected that he had been drinking. The plaintiffs alleged that the security force had a duty to prevent the suspected drunk driver from getting behind the wheel and leaving the racetrack.

Considering whether the racetrack could be held liable for the failure of its security officers to arrest the suspected drunk driver, the court reasoned, "When an officer makes an arrest, he is using power conferred by the state, not by his private employer. A private employer has no right to interfere with this power. The employer does not 'rent' the state's police power when it employs an off-duty officer." *Id*. at 539. The court further explained that "'it is the nature of the acts performed and not whether the officer is on or off duty, in or out of uniform, which determines whether the officer is engaged in the performance of his official duties.'" *Id*. (quoting *Tapp v. State*, 406 N.E.2d 296, 302 (Ind. Ct. App. 1980)). The court held that the racetrack could not "control the arrest powers that its security [officers] derived from the state" and thus the security officers' inaction did not expose the racetrack to liability. *Id*.

Next, CFB refers to *Gentry v. Hockett*, which presented one issue to the Court of Appeals of Indiana: whether the private employer of an off-duty police officer could be held vicariously liable for acts committed by the officer while attempting to apprehend individuals he believed had stolen from the employer.  498 N.E.2d 405 (Ind. Ct. App. 1986), *reh'g denied*.  The off-duty officer worked security for an auto dealer and while at work the officer observed what he believed to be a person stealing a vehicle.  In plain clothes and driving an unmarked police car, the officer pursued the vehicle at speeds up to eighty miles an hour and during the chase called a police dispatcher for assistance.  Approximately one mile after the chase began, the stolen vehicle ran a red light and struck a third vehicle, injuring its driver.  The driver of the third vehicle sued the private employer, alleging vicarious liability for the officer's actions.  The court denied the driver's claim and in doing so cited the *Sports* holding and relied on its reasoning.  *See id*. at 406.  Based on the set of facts before it, the court in *Gentry* concluded that the officer was within the scope of his public rather than his private employment duties when the collision occurred and that the private employer was therefore not liable.  *See id*.[1]

CFB builds on the reasoning set forth in *Sports* and *Gentry*, and identifies the following as facts militating in favor of finding that Officer Rivera acted in his public employee capacity while committing the alleged offenses against Plaintiffs: he placed police issued handcuffs on Plaintiffs;

---

[1]CFB also relies on *Sports Bench, Inc. v. McPherson*, 509 N.E.2d 233 (Ind. Ct. App. 1987).  The Court finds *McPherson* largely inapplicable to this case.  The *McPherson* court resolved the case before it pursuant to the Indiana Fireman's Rule whereby "professionals, whose occupations by nature expose them to particular risks, may not hold another negligent for creating the situation to which they respond in their professional capacity."  *Id*. at 235 (citations and quotations omitted).  Applying the Fireman's Rule, the court held that the plaintiff off-duty police officers could not sue a tavern owner for allegedly creating a risk that resulted in the plaintiffs being shot.  *See id*. at 235-36.  Here, despite Plaintiffs' arguments to the contrary, the Fireman's Rule and analysis of *McPherson* are inapplicable because the off-duty officer, Officer Rivera, has not filed any charges, and this case is controlled by different issues.  To the extent the *McPherson* court discussed the plaintiffs' status as police officers, it based its discussion on the same law cited in *Sports* and its discussion does not affect the Court's reasoning.

he wore his full police uniform including his gun holster and a vest labeled "POLICE"; he called the ECPD and received police back up at the scene; Betty testified at deposition that a City of East Chicago police officer (referring to Officer Rivera) detained and arrested her; and the City of East Chicago police officers booked Plaintiffs and placed them in a cell and created ECPD incident reports.   In addition, the Court notes that in their brief opposing summary judgment, Plaintiffs quoted the ECPD's Rules and Regulations, which provide that "a member of the force shall be in an 'on duty' status at all times for the preservation of the peace and the protection of life, liberty or property."  *See* ECPD Rules & Regulations, § 201.3.  This point also weighs in favor of adopting CFB's argument.

Plaintiffs disagree with CFB's argument and contend that Indiana jurisprudence is more complex with respect to this issue than the holdings of *Sports* and *Gentry*.  Plaintiffs argue that Indiana courts employ different views to examine liability implications of an off-duty police officer working for a private employer.  To highlight that no single method of consideration exists within Indiana law, Plaintiffs refer to United States Court of Appeals for the Seventh Circuit's decision in *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751 (7th Cir. 2006).  In *Pourghoraishi*, the court considered whether a gas station could be held liable for alleged unconstitutional acts against a customer committed by an off-duty police officer employed by the gas station as a security guard.  In its analysis of the gas station's tort liability, the court found that during the events complained of, the off-duty officer acted solely in his capacity as a police officer.  The court went on to examine 42 U.S.C. § 1983 claims alleged by the plaintiff.  The court concluded that "Indiana law addressing the question [of when an off-duty police officer employed as a security guard acts as an agent for the private employer] is less than crystal clear."  *Id.* at 763.  The court identified two lines of Indiana

10

state court cases reaching different conclusions on the issue.  Plaintiffs seize this language as a basis for their argument that different lines of precedent exist, and that at least one of those lines should influence the Court to deny summary judgment in this case.

The first line of precedent, seen in two cases decided by the Court of Appeals of Indiana, Fourth District, holds that "police officers who work as security guards when off duty, shed their 'cloak of State Agency and become agents of the private hiring authority, thereby requiring no more of them with regard to a defendant's constitutional rights than of any other citizen.'"  *Rode v. State*, 524 N.E.2d 797, 800 (Ind. Ct. App. 1988) (quoting *Bowman v. State*, 468 N.E.2d 1064, 1068 n.1 (Ind. Ct. App. 1984) (citations omitted)).  Based on this reasoning, the court in *Rode* held that a private non-police officer fire investigator looking into a possible arson was not required to give a suspected arsonist whom the investigator questioned *Miranda* warnings because the investigator acted as a private citizen.  *See* 524 N.E.2d at 800.  And in *Bowman*, the court held that an off-duty police officer working as a security guard in a department store was not required to give *Miranda* warnings to a store patron prior to questioning the patron based on suspicion of shoplifting because he was not acting in his law enforcement capacity while questioning the suspected shoplifter and the suspect was not in custody as contemplated by *Miranda*.  *See* 468 N.E.2d at 1068 (citations omitted).

The holdings of *Rode* and *Bowman* are limited to a discussion of *Miranda* and the requirement that police officers provide warnings under particular circumstances.  Insomuch as *Bowman* discusses the classification of off-duty police officers working as security guards, the reasoning of the court is consistent with *Sports* and *Gentry* that whether specific acts performed by a police officer fall within his public duties depends upon the nature of those acts.  *See id.*

11

Decided by the Court of Appeals of Indiana, First District, the second line of cases, actually a single case, identified by the court in *Pourghoraishi* also discusses *Miranda* warnings. Presented with a situation in which a store manager and two off-duty police officers working as store security guards detained, questioned, and asked a suspected shoplifter to sign a confession statement, the court in *Owen v. State* relied on precedent in *Tapp*. *See Owen v. State*, 490 N.E.2d 1130, 1134-35 (Ind. Ct. App. 1986). In *Tapp*, the court set forth the standard central to CFB's argument in this matter: "it is the nature of the acts performed and not whether the officer is on or off duty, in or out of uniform, which determines whether the officer is engaged in the performance of his official duties." 406 N.E.2d at 302. Based on *Tapp* and its progeny, the *Owen* court held that because the interrogating security guard identified himself as a police officer, showed his police identification, and summoned other off-duty police officers to the scene, he conducted a custodial interrogation that required *Miranda* warnings. *See Owen*, 490 N.E.2d at 1137.

Like the first line of cases identified by *Pourghoraishi*, *Owen* does not alter or cast doubt upon the reasoning of *Sports* and *Gentry* as to when an off-duty police officer working as a security guard performs public functions as opposed to private functions. Rather than changing the analysis, *Owen* relies on *Tapp*, which *Sports* and *Gentry* also relied on to conclude that the court must consider the particular facts before it when determining whether an off-duty police officer acted in a public or private role. Further, *Owen* like the other cases cited in *Pourghoraishi*, is a *Miranda* specific analysis and its holding is not persuasive here.

Plaintiffs continue their efforts to topple the precedential value of *Sports* and *Gentry* and offer a final line of reasoning for the Court to consider. Embodied by a single Indiana case, Plaintiffs categorize this line of reasoning as a dual employment analysis. In *Syberg v. Marion*

*County Sheriff's Department*, the court considered a department store employee plaintiff's lawsuit arising from the actions of two off-duty police officers working double duty as department store security guards.  No. 1:05-CV-1706, 2007 WL 2316467 (S.D. Ind. Aug. 7, 2007).  The plaintiff sued both of the security guards' employers and alleged that the off-duty officers unlawfully arrested him during work hours at the department store for falsely identifying himself as a police officer.  Prior to the arrest, the officers investigated the plaintiff for six months.  The officers discussed their investigation with a department store loss control officer as well as the store's national vice-president of loss prevention, who expressed interest in any findings.  In addition, prior to arresting the plaintiff, the officers obtained authorization from a law enforcement supervisor for investigation related activities.

In effectuating the arrest, the officers worked along side the store's loss control officer.  The officers executed a sting during which they purportedly caught the plaintiff falsely identifying himself as a law enforcement officer, a violation of store policy as well as Indiana law.  The officers then moved in to make the arrest.  During the arrest, the officers announced that they were police officers.  At the time of the arrest, the officers were not on-duty nor were they paid by the private employer for their time.  The officers admitted during litigation discovery that they were acting as police officers during the arrest.

Evaluating whether the sheriff's department should be indemnified by the private employer,[2] the court did not mention or attempt to distinguish *Sports* and *Gentry*.  The court concluded that the department store and the police department bore equal respondeat superior liability for the officers' actions.  *See id.* at *4.[3]  The officers were not only working for the department store by protecting it against unlawful employee actions, the court found, but were acting in their roles as police officers by enforcing the law.  *See id.*[4]

Plaintiffs also cite several cases from foreign jurisdictions in support of their dual employment argument that CFB and the City of East Chicago bear joint liability for Officer Rivera's actions.  *See Lovelace v. Anderson*, 785 A.2d 726 (Md. 2001) (finding that private employer of an

---

[2]CFB makes much of the fact that the *Syberg* court considered a cross-claim for indemnification.  CFB contends that the procedural posture of *Syberg* deflates its precedential value in this matter.  The court disagrees.  Prior to the district court's ruling in *Syberg*, a jury awarded a monetary judgment, including punitive damages, to the plaintiff.  All issues as to liability between the public and private entity defendants had by agreement of the parties been left for the court to resolve.  The court analyzed liability under common law indemnity principles, which provide "a means for otherwise faultless parties to seek relief against those who actually caused the harm."  2007 WL 2316467, at *4.  Thus, the *Syberg* holding that a municipality and a private employer can share in the liability resulting from an off-duty police officer's actions during private employment is applicable beyond the bounds of the setting in that case.

CFB also specifically refers to the *Syberg* court's description that the case before it "arose under some unusual circumstances."  *Id.* at *1.  CFB does not acknowledge the beginning of that sentence, in which the court wrote, "This case presents legal issues that can arise from a common practice, the employment of police officers as part-time private security guards . . ."  *Id.*  Thus, the analysis in *Syberg* is a common one, but the specific holding controls a somewhat unique fact setting.

[3]CFB also argues against lending credence to the *Syberg* decision because the court deemed it an opinion "NOT INTENDED FOR PUBLICATION IN PRINT."  *See* 2007 WL 2316467.  While an unpublished opinion provides no precedential value, *see Bankers Trust Co. v. Old Republic Ins. Co.*, 7 F.3d 93, 94-95 (7th Cir. 1993) ("Lack of publication usually reflects the court's belief that the dispute is one-sided, sapping the disposition of precedential value"), in today's electronic database legal research driven world, the denotation "NOT INTENDED FOR PUBLICATION IN PRINT" indicates an intent to spare the opinion from publication in hard bound case books and instead to disseminate it through electronic channels.

[4]Plaintiffs also rely on *Doe v. Allied-Signal, Inc.*, in which the court examined Indiana law and found that for respondeat liability purposes a janitor was simultaneously an employee of two employers.  925 F.2d 1007, 1008 (7th Cir. 1991).  Finding that each employer maintained a degree of control over the janitor's wage, work schedule, discipline, and continued employment, the court held that both were her employers.  *See id.*  The court stated that under Indiana law, the test for dual employment comes down to whether "both employers possess a substantial, but not necessarily exclusive, right or power of control over the employee and the means, manner, and method of his performance."  *See id.* at 1008-09 (citations and quotations omitted).  *Allied-Signal* is not helpful here due to the added element in this case of one of the individual Defendant's jobs involving public duties.

off-duty police officer was subject to liability if the officer acted within the scope of his private employment in attempting to stop a robbery);[5] *White v. Revco Discount Drug Centers, Inc.*, 33 S.W.3d 713, 722 (Tenn. 2000) ("eliminating vicarious liability for private employers who hire off-duty police officers encourages such employers to shift their risk of liability to the municipality solely because their employees are also employees of the local police department").

CFB argues that the facts in *Syberg* bear more indicia of private employer involvement and control than those presented by the instant case. The private employer in *Syberg* participated in the planning and oversaw the execution of the investigation and the arrest that led to the alleged constitutional violations. A store employee and a national vice-president were actively involved throughout the investigation, evidencing multiple levels of involvement, and the employer's control over the plan. Thus it was clear that at least in part, the officers were acting on behalf of the private employer. CFB contrasts the instant situation and highlights the absence of any bank involvement in Officer Rivera's confrontation and arrest of Betty and Raymond. Indeed, in the instant case, Officer Rivera arrested Plaintiffs without consulting any other bank employee. The incident occurred in a matter of minutes and Officer Rivera, with the eventual support of other police officers, carried out the actions without CFB's involvement. The facts in *Syberg* are in stark contrast; the differences in private employer involvement are such that the holding in *Syberg* does not control the instant case.

While Indiana law may be "less than crystal clear" when it comes to liability implications created by an off-duty police officer working double duty for a private employer, its imperfections

---

[5]Discussing different lines of precedent, the *Lovelace* court acknowledged that "[t]he most frequent 'middle ground' is to examine the nature or the character of the off-duty officer's conduct and to determine whether it is the type of act for which the private employer hired the officer or is the type of act which police officers perform." 785 A.2d at 746 n.8 (citations omitted). Thus, *Lovelace* acknowledges the Indiana courts' approach reflected in *Sports* and *Gentry*.

do not cloud or otherwise prevent a resolution in the instant case.  CFB's argument, analyzed against the backdrop of facts seen in a light most favorable to Plaintiffs, is prevailing.  That Officer Rivera performed police functions by arresting Betty and Raymond establishes that during the acts complained of, he acted in his role as a City of East Chicago Police Officer.  The first action complained of–the physical contact involved in Betty's arrest–and the events that allegedly transpired thereafter–detention, Raymond's arrest, and assault and battery–were committed by Officer Rivera and the other individual Defendants in their capacities as police officers.[6]  Pursuant to Indiana precedent, CFB cannot be held liable for those actions.

Plaintiffs' argument is not without merit.  Plaintiffs correctly point out that CFB employed Officer Rivera as a security guard, whose duties were closely related to his duties as a police officer.  Further, during his confrontation with Plaintiffs, Officer Rivera was present in the bank lobby due solely to his role as a private employee, which seems to indicate that he was acting in furtherance of his duties as a bank employee.  Also, when he approached Betty, Officer Rivera likely sought to at least in part enforce the private rules of conduct of the bank.  But it was the manner that Officer Rivera addressed the situation that precludes Plaintiffs from collecting damages against CFB.  As evidenced by his use of police arrest powers, Officer Rivera acted pursuant to his public powers.

Plaintiffs also point to CFB's Security Officer Policy Manual, which provides that "all officers are required to wear their law enforcement uniforms."  Pls.' Resp. Br. Summ. J., Ex. G., at

---

[6]In their response brief, Plaintiffs argue that Officer Rivera performed "citizen's arrests." Pls.' Resp. Br. Summ. J. at 7.  However, Plaintiffs mention this theory in passing, only raising the issue, and do not provide any legal or factual argument in support of their contention that Officer Rivera made citizen's arrests.  While they refer to two cases discussing citizen's arrests, Plaintiffs offer no theory as to what the implications of such arrests would be in this case. The clear evidence in this case, including that provided by Plaintiffs' deposition testimony, is that Officer Rivera effected Plaintiffs' arrests in his role as a police officer.  Thus, Plaintiffs' "citizen's arrests" theory, is unpersuasive, and not sufficient for consideration.

11.  Conversely, the ECPD Rules and Regulation manual provides, "The uniform, or parts of the uniform, shall not be worn by members of the department engaged in outside employment to which they have not been officially detailed."  Pls.' Resp. Br. Summ. J., Ex. E, at 62.  Plaintiffs contend that Officer Rivera's compliance with the CFB manual, and disobedience of the ECPD regulation, reflect that CFB wielded sufficient control to establish employer liability.

However, Plaintiffs' evidence does not change the law, which prescribes that a private employer cannot control the arrest powers of an employee who is an off-duty police officer and who has twenty-four hour a day responsibilities to the police department.  With no power to control his police functions, CFB cannot be held liable for the actions complained of by Plaintiffs.  Imposing liability on a defendant that has no control over the alleged wrong is an untenable position for the Court to endorse.  As a result, the Court grants CFB's Motion for Summary Judgment as to Plaintiffs' Indiana state law tort claims.

## B.  42 U.S.C. § 1983 liability

Having foreclosed Plaintiffs' opportunity to recover from CFB for their tort claims, the Court proceeds to analyze Plaintiffs' claims under 42 U.S. C. § 1983.  Included in the eight Counts of their Complaint, Plaintiffs assert claims under 42 U.S.C. § 1983 against Officers Rivera, Blackwell, Zygmontowski, Lieutenant Snyder, and the City of East Chicago.  The lone count naming CFB as a Defendant alleges a cause of action under the doctrine of respondeat superior.  Though Plaintiffs do not include a separate 42 U.S.C. § 1983 claim against CFB, in their factual allegations they contend that "at all relevant times [Officer Rivera acted] under the direction, authority and control of [CFB]."  Compl. at ¶¶ 20, 51.  A mess in the kitchen made preparing a family meal does not prevent serving the main course, and Plaintiffs' inartful pleading, under the liberal pleading

17

requirements set by Rule 8 of the Federal Rules of Civil Procedure, will not prevent the Court from considering the substance of their 42 U.S.C. § 1983 claim against CFB.

The subject of Plaintiffs' 42 U.S.C. § 1983 action is failure to train.  Because the alleged failure to train necessarily occurred before the specific events complained of by Plaintiffs in their Indiana tort law claims, the Court's disposition of the tort claims above does not also dispose of Plaintiffs' claims under 42 U.S.C. § 1983.  To the extent their 42 U.S.C. § 1983 claims are premised on different factual allegations, they cannot be resolved by the prior analysis.

Turning to substance, it is a difficult burden for a plaintiff to establish a viable claim against a private entity employer under 42 U.S.C. § 1983 based on the actions of an employee.  While a defendant need not be an officer of the State to be held liable under 42 U.S.C. § 1983, *see Woods v. Clay*,  No. 01 C 6618, 2005 WL 43239, at *21 (N.D. Ill. Jan. 10, 2005) (citations omitted), liability may not be based merely on the employer-employee relationship, *see Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982).  It is well-settled that a private employer may not be held vicariously liable under 42 U.S.C. § 1983 for deprivation of others' civil rights caused by its employees.  *See id.* (citations omitted).  Rather, to successfully assert a claim, a plaintiff must first show that the private actor engaged in joint action with the State or its agents.  *See id.*  "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of 42 U.S.C. § 1983 actions."  *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980).  Second, the plaintiff must demonstrate that the private employer has in place an "impermissible policy" or a "constitutionally forbidden" rule or procedure.  *Iskander*, 690 F.2d at 128 (citing *Polk Co. v. Dodson*, 454 U.S. 312, 326 (1981)).  That policy or rule must be the "moving force" of the constitutional deprivation.  *Id.* (quoting *Monell*, 436 U.S. at 694).

In *Woods*, the plaintiffs filed suit against a sports bar, alleging that the business was responsible, under 42 U.S.C. § 1983, for the conduct of off-duty police officers employed as security guards. The officers arrested the plaintiffs at the bar. The court reasoned that the bar hired the off-duty officers to police its premises and ensure the safety of its patrons and staff, in part through the effect of their wearing police uniforms, carrying police issued weapons, and wearing their police badges. Based on these indications of police action, the court concluded that the bar acted under color of state law by employing the offending officers. *Id*. at *21-23. Next, the court considered whether the plaintiffs offered evidence that the bar caused a deprivation of their constitutional rights through one of its official polices or practices. *Id*. at *23. The plaintiffs argued that the bar and grill deprived them of their constitutional rights by maintaining a policy of hiring police officers to work security, by instructing the police officers as to how to perform their duties, by failing to have safety precautions in place, and by failing to have a written security policy. The court found this evidence sufficient to create a triable issue of fact and denied the bar's motion for summary judgment. *See id*. at *24; *see also Groom v. Safeway, Inc.*, 973 F. Supp. 987, 991 (W.D. Wash. 1997) (court concluded that by hiring an armed, uniformed off-duty police officer to work as a security guard, the defendant grocery store had "hired an instrument of the state's power" and found that the relationship between the grocery store and the police department was sufficiently interrelated that the relevant actions of the store fell under color of state law).

CFB relies on *Stewart v. Harrah's Illinois Corp.*, in which the court undertook a similar analysis. No. 98 C 5550, 2000 WL 988193 (N.D. Ill. July 18, 2000). The court considered a private employer casino's potential 42 U.S.C. § 1983 liability for an alleged excessive use of force violation by an off-duty police officer working as a security guard at the casino. The facts in *Stewart* are

19

distinguishable from the facts presented in *Woods* and those presented in the instant case.  The private employer casino in *Stewart* had an agreement with a local police department whereby the department provided security assistance for the casino in the form of off-duty uniformed police officers.  The police department compensated the off-duty police officers for their time at the casino, and the officers were at the casino to enforce the law, rather than casino rules.  In addition, the officers could be called away from the casino at any time to attend to police matters.

The *Stewart* court found that "a private entity is deemed to be acting under color of law only when it 'is a willing participant in joint action with the State or its agents.'" 2000 WL 988183 at *9 (quoting *Dennis*, 449 U.S. at 27).  For a plaintiff to succeed, the court found that he must establish the existence of a conspiracy, or an agreement as to a course of action in which the private party and the State have a common goal.  *See id.* (citations omitted).  To show a conspiracy, a plaintiff must show that the state actor and the private entity came to an understanding to deprive the plaintiff of a constitutional right.  *See id.* (citations omitted).  The court concluded that the off-duty officers were not bound by the casino's rules or regulations and operated under their own authority as police officers, and found that no material fact existed with respect to whether the parties had an agreement to make unconstitutional arrests.  *Id.* at *11-12.  The court granted the casino's motion for summary judgment as to the 42 U.S.C. § 1983 claim filed against it.  *Id.* at *12.

The facts here are similar to the facts presented in *Woods* and *Groom*.  CFB employed Officer Rivera during his off-duty time to work as a bank security guard.  Officer Rivera worked at the bank in his police issued uniform and while wearing his police issued identification badge.  CFB compensated Officer Rivera for his work at the bank.  By employing an off-duty police officer as a bank security guard, CFB reaped benefits from his status, experience, and skills as an on-duty

20

police officer.  In addition, the presence of Officer Rivera in the bank lobby dressed in police uniform and wearing police identification sent a message that state sponsored law enforcement protected the business.

Further, although Officer Rivera, in effecting Plaintiffs' arrests, may have been acting as a police officer, he did so on CFB's time.  Plaintiffs contend that while on the clock at CFB, Officer Rivera could not have wandered out of the store to patrol the surrounding neighborhood.  On point, the CFB Security Officer's Policy Manual provides, "you are expected to begin work at the scheduled starting time and should not leave your work area without your supervisor's permission." Pls.' Resp. Br. Summ. J., Ex. G, at 7.  Thus, the relationship between CFB and Officer Rivera was such that by employing Officer Rivera CFB acted under color of state law.

Turning to the second prong that Plaintiffs must show, there is little evidence of any CFB policy or practice of unconstitutional action.  Rather than attempting to show such a policy or practice, Plaintiffs contend that CFB controlled some key aspects of Officer Rivera's employment and that issues of fact persist as to whether CFB instructed Officer Rivera with regard to the performance of his duties, whether CFB had safety precautions in place, and whether CFB had a written security policy.  Plaintiffs do not offer any evidence of a lack of safety precautions or an inadequate security policy.  They instead urge the Court to deny CFB's Motion for Summary Judgment so that these issues of fact can be further explored.

The burden to produce evidence sufficient to create a genuine issue of material fact lies with the non-moving party at summary judgment, here, Plaintiffs.  Discovery in this matter closed on November 1, 2007.  That Plaintiffs cannot produce evidence to create a genuine issue of material fact as to whether CFB had in place a policy or practice that resulted in deprivation of their

constitutional rights is fatal to their 42 U.S.C. § 1983 claim against CFB.  The Court grants CFB's

Motion for Summary Judgment as to Plaintiffs' 42 U.S.C. § 1983 claims.

## ANALYSIS OF CITY OF EAST CHICAGO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The City of East Chicago Defendants argue that summary judgment should be granted in

their favor for the following reasons: (1) Plaintiffs filed a deficient Notice of Tort Claims pursuant

to the Indiana Tort Claims Act ("ITCA"); (2) probable cause supported Plaintiffs' arrests; (3) Officer

Rivera is entitled to qualified immunity; (4) Plaintiffs have not shown any evidence that Officers

Zygmontowski and Blackwell or Lieutenant Snyder violated their constitutional rights; (5) Betty

received adequate medical care; and (6) Plaintiffs have shown no evidence of an unconstitutional

policy, practice, or custom by the municipality.  Plaintiffs contend that genuine issues of material

fact remain as to the following: whether Officer Rivera had probable cause to arrest Betty, whether

Officer Rivera used excessive force during his arrest of Betty, whether probable cause existed to

arrest Raymond, whether the City of East Chicago Defendants acted with deliberate indifference to

the medical treatment of Betty, and whether the City of East Chicago Defendants created a policy

or custom of deliberate indifference to the constitutional rights of citizens through a failure to train

or supervise police officers.

### A.  ITCA notice requirement

The City of East Chicago Defendants acknowledge that Plaintiffs timely provided a Notice

of Tort Claim but contend that Plaintiffs' Notice does not comply with the ITCA.  In relevant part,

the ITCA provides:

22

The notice required by sections 6, 8, and 9 of this chapter must describe in short and plain statement the facts on which the claim is based. The statement must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice.

Ind. Code § 34-13-3-10. Section 8 dictates that "a claim against a political subdivision is barred unless notice is filed with: (1) the governing body of that political subdivision; and (2) the Indiana political subdivision risk management commission . . . within one hundred eighty (180) days after the loss occurs." Ind. Code § 34-13-3-8.

The purpose of the ITCA notice requirement is to inform state officials with reasonable certainty of the alleged incident and surrounding circumstances so they may investigate, determine whether liability exists, and prepare a defense to the claim. *See Rickets v. State*, 720 N.E.2d 1244, 1246 (Ind. Ct. App. 1999). If the purpose of the notice requirement is satisfied, substantial compliance will suffice and technical compliance need not be carried out. *See id*. To substantially comply, the notice must not only inform the State of the facts and circumstances underlying the allegation, but must also advise the State of the injured party's intent to assert a tort claim. *See id*.

Further, notice requirements such as the provision contained within the ITCA "are in derogation of common law, [and as a result] are to be strictly construed against limitations on a claimant's right to bring suit." *Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 735 (Ind. Ct. App. 2000). "It has long been the policy of Indiana to liberally apply the ITCA notice requirements to plaintiffs." *Porter v. Fort Wayne Cmty. Schs.*, 743 N.E.2d 341, 344 (Ind. Ct. App. 2001) (citing *Scott v. Gatson*, 492 N.E.2d 337, 340 (Ind. Ct. App. 1986)).

Considering whether a state law prerequisite to filing a tort claim against a municipal entity can bar a 42 U.S.C. § 1983 claim, the Supreme Court of the United States found that under the

23

Supremacy Clause, it cannot. *See Felder v. Casey*, 487 U.S. 131, 152-53 (1988). The Court reasoned that "[s]tate courts simply are not free to vindicate the substantive interests underlying a state rule of decision at the expense of the federal right." *Id.* at 152; *George v. Hatcher*, 527 N.E.2d 199, 201 (Ind. Ct. App. 1988) (adopting *Felder* holding). Under *Felder*, the ITCA's requirements cannot bar Plaintiffs' 42 U.S.C. § 1983 claims.

Plaintiffs' state law claims, however, are subject to the ITCA's requirements. *See Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 648-49 (7th Cir. 2006). The City of East Chicago Defendants draw comparisons between the instant case and *Smith*, in which the court found the plaintiffs' tort claims notice to be factually sufficient but otherwise insufficient in that it was not sent to a potential defendant and did not refer to the potential defendant within the notice. 741 N.E.2d at 737. Thus, the potential defendant did not have notice, or any meaningful way with which to acquire notice, that the plaintiffs had a claim against him individually. *See id.*

Here, Plaintiffs mailed a Notice of Tort Claim on July 30, 2004, within the 180 day time limit, to then City of East Chicago Mayor, Robert A. Pastrick; Corporation Counsel Frank Callahan; City Attorney L. Felipe Sanchez; and the Indiana Political Subdivision Risk Management Fund in Indianapolis. Plaintiffs' Notice set forth the facts and circumstances surrounding the events that occurred on February 6, 2004. The Notice informed its recipients of Plaintiffs' allegations that Officer Rivera physically assaulted and battered Betty, causing her serious and permanent bodily injury. Plaintiffs explained that Officer Rivera "grabbed [Betty] from behind, twisted her arm, moved her over to a chair and kicked her in the area of the right knee in such a manner as to cause her right leg to buckle and she collapsed." City of East Chicago Defs.' Br. Summ. J., Ex. 10, at 3. With regard to Raymond's claims, the Notice provided that Officer Rivera's attack of Betty took

24

place in Raymond's line of sight, which caused Raymond to suffer emotional distress and a loss of consortium.

The City of East Chicago Defendants' argument that the allegations set forth in Plaintiffs' Notice did not provide forewarning of the claims brought in the instant lawsuit is not persuasive. The Notice clearly laid out the bases of Plaintiffs' claims.  Similarly, the City of East Chicago Defendants' argument that Plaintiffs did not send the Notice to the appropriate officials is unavailing.  By sending the letter to the Mayor and two city attorneys, as well as the State Political Risk Management Fund, Plaintiffs provided adequate notice to the appropriate authorities.

The City of East Chicago Defendants next argue that the Notice is inadequate because it identified Officer Rivera as the only actor involved in the incident.  The ITCA requires that Plaintiffs "name[] all persons involved if known."  Ind. Code § 34-13-3-10.  Plaintiffs represent that Officer Rivera was the only defendant known at the time they prepared the Notice.  However, when they prepared the Notice, by the nature of their claims, Plaintiffs were aware that additional potential individual defendant police officers were involved in the incident.  Although Plaintiffs may not have known the identities of Officers Zygmontowski and Blackwell or Lieutenant Snyder (hereinafter collectively referred to as "remaining Officers") at the time they sent the Notice, they were aware of their existence.  By failing to mention the involvement of additional police officers, Plaintiffs did not provide notice to the City of East Chicago Defendants that potential claims existed.  The City of East Chicago Defendants were placed on notice of only a claim against Officer Rivera.  They had no reason to investigate potential claims against other officers in connection with the February 6, 2004 incident.  Plaintiffs thus failed to satisfy the purpose of the ITCA notice requirement as to their

claims against the remaining Officers.  The Court grants summary judgment in favor of Officers Zygmontowski and Blackwell and Lieutenant Snyder as to Plaintiffs' state law tort claims.

The City of East Chicago Defendants also contend that Plaintiffs' Notice failed to address the issue of damages.  With regard to damages, the ITCA requires that Plaintiffs provide "the amount of the damages sought."  Ind. Code § 34-13-3-10.  Here, Plaintiffs failed to identify a dollar amount of damages sought.  They did, however, outline their claims and the nature of the damages suffered.  Plaintiffs explained that Betty "had to be hospitalized for several days [and] . . . suffered a coronary incident as a result of [Officer Rivera's] brutality, [and] is now unable to walk without assistance and has been permanently injured."  City of East Chicago Defs.' Br. Summ. J., Ex. 10, at 3.  Plaintiffs' provided a similar explanation for the damages suffered by Raymond.  The types of loss included in the Notice are the bases for the monetary damages sought by Plaintiffs in this lawsuit: compensatory damages for Plaintiffs' alleged physical and emotional injuries, punitive damages for the actions causing Plaintiffs' physical and emotional injuries, and attorney's fees and costs.  The damages described in Plaintiffs' Notice satisfy the purpose of the ITCA and put the City of East Chicago Defendants on notice of the incident and surrounding circumstances so they could investigate, determine whether there was liability, and prepare a defense.  Plaintiffs' failure to technically comply and assert a damage value is not fatal to their claims.

In a final argument submitted in their reply brief, in a section addressing the ITCA notice requirement, the City of East Chicago Defendants attempt to construct an argument that Raymond's claim for intentional infliction of emotional distress is improper because he did not see any Defendant strike Betty.  This argument is not an ITCA argument, as it bears no relation to notice, and it was not raised in the City of East Chicago Defendants' Motion for Summary Judgment or

26

original brief.  As such, it is not proper for consideration at this juncture.  The City of East Chicago Defendants' Motion for Summary Judgment is granted as to Plaintiffs' state law tort claims against Officers Zygmontowski and Blackwell and Lieutenant Snyder and is denied with respect to Plaintiffs' state law tort claims against all other Defendants.

### B.  Probable cause

The City of East Chicago Defendants argue that there was probable cause to arrest Plaintiffs and that probable cause is an absolute bar to a 42 U.S.C. § 1983 claim for unlawful arrest or false imprisonment.  Plaintiffs respond that a reasonable jury could conclude that Officer Rivera lacked probable cause to arrest them and that summary judgment is not appropriate.

In the Seventh Circuit, the law is settled that "probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution."  *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir. 1997)).  A police officer has probable cause to make an arrest when the officer possesses reasonably trustworthy information and knows of facts and circumstances that are sufficient to cause a prudent person to believe that the suspect committed an offense.  *See id.*  The court measures probable cause "not on the facts as an omniscient observer would perceive them," but "as they would have appeared to a reasonable person in the position of the arresting officer."  *Kelley v. Myler*, 149 F.3d 641, 646 (7th Cir. 1998) (citations and quotations omitted); *see also Woods v. City of Chi.*, 234 F.3d 979, 987 (7th Cir. 2000).  The applicable test, whether a reasonable officer would have believed the person committed a crime, is an objective one. *See Kelley*, 149 F.3d at 646.

Here, the City of East Chicago Defendants argue that they had probable cause to arrest Plaintiffs for disorderly conduct.  Disorderly conduct, as defined by Indiana statute, occurs when a person "recklessly, knowingly or intentionally: (1) engages in fighting or in tumultuous conduct; (2) makes unreasonable noise and continues to do so after being asked to stop; or (3) disrupts a lawful assembly of persons."  Ind. Code § 35-45-1-3(1), (2).  The arrest report indicates that Officer Rivera arrested Plaintiffs under subsection (2) of the statute.  Indiana courts have held that "the volume of [the arrestee's] speech is critical in determining whether it was unreasonable . . ." *Johnson v. State*, 719 N.E.2d 445, 448 (Ind. Ct. App. 1999); *see also Morfin v. City of East Chicago*, 349 F.3d 989, 999 (7th Cir. 2003).  "[I]n order to support a conviction for disorderly conduct, 'The State must prove that a defendant produced decibels of sound that were too *loud* for the circumstances.'" *Johnson*, 719 N.E.2d at 448 (quoting *Whittington v. State*, 669 N.E.2d 1363, 1367 (Ind. 1996)); *see also Morfin*, 349 F.3d at 999.

In *Morfin*, arresting police officers, ultimately defendants to the lawsuit, argued that they had probable cause to arrest the plaintiff-arrestee under Indiana statute for disorderly conduct. Examining whether probable cause existed, the court noted that the parties' versions of the facts relevant to disorderly conduct were in dispute.  Several of the arresting officers testified that the plaintiff made threatening, hostile statements at the scene.  However, at least one arresting officer testified at deposition that the plaintiff never raised his voice.  The plaintiff himself further testified that he never directed any threats or obscenities toward the officers at the scene.  The court determined that to find probable cause, it would have to adopt the version of events set forth by several of the officers but contradicted by the plaintiff and another officer.  The court found that "such a credibility determination at summary-judgment stage constitutes error" and sent the issue

28

to the trier of fact for resolution.  *Morfin*, 349 F.3d at 999 (citations omitted); *see also Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)) ("Where the material facts specifically averred by one party contradict the facts averred by a party moving for summary judgment, the motion must be denied").

Similarly, in the instant case, the parties' accounts of what occurred during the incident are quite different.  At her deposition, Betty testified that she was not annoyed while talking with the bank tellers and did not raise her voice at any time during the discussion, nor did the supervising teller raise her voice when speaking with Betty.  At his deposition, Raymond testified that he was excited during the incident but did not remember raising his voice, and testified that he does not use curse words.

Conversely, Officer Rivera's arrest report provides that Betty yelled loudly at a bank teller, used profanity, and refused to comply with his request that she calm down.  Officer Rivera wrote that Betty stated "your [sic] going to have to take me to jail cause [sic] I aint [sic] leaving."  City of East Chicago Defs.' Br. Summ. J., Ex. 2, at 4.  Officer Rivera also recounted in the report that Raymond then entered the bank and disrupted the business by yelling and using profanity.  Officer Rivera noted that there were approximately three customers in the bank lobby during the incident.

The City of East Chicago Defendants also rely on the testimony of the bank tellers present during the incident.  Ms. Quezada testified that Betty became upset in the bank and used curse words.  She also testified that Raymond entered the bank and used a loud voice to speak to Betty.  Ms. Quezada did not hear Raymond say anything to Officer Rivera.  Ms. Quezada testified that although no customers left the bank or declined to conduct business with the bank, Raymond disrupted bank business by using a loud voice.  The other teller, Ms. DelaPaz, testified that Betty

became upset spoke loudly and said she would not pay for her pin number.  Ms. DelaPaz testified that she heard Betty use curse words and recalled that Betty refused to calm down and continued to create a scene.

Based on Plaintiffs' deposition testimony, and evaluating the evidence in a light most favorable to Plaintiffs, a reasonable jury could find that Betty and Raymond did not make unreasonable noise.  *See Pourghoraishi*, 449 F.3d at 762 (court held that if the trier of fact adopted the plaintiff's version of events and found that the plaintiff did not commit any element of the disorderly conduct for which he was arrested, then the arresting officer could not have reasonably concluded that he had probable cause).  Betty and Raymond, in sworn deposition testimony, allege a series of events that if adopted by the trier of fact, are bereft of probable cause.  The Court cannot at the summary judgment stage choose to adopt one version of events over another, and must now deny the City of East Chicago Defendants' motion for summary judgment on the issue of probable cause.

### C.  Qualified immunity

The City of East Chicago Defendants next contend that Officer Rivera is entitled to qualified immunity against Plaintiffs' claims because he lawfully took Plaintiffs into custody.  Plaintiffs contend that genuine issues of material fact exist as to the events surrounding their arrests and that Officer Rivera is not entitled to qualified immunity.

Government officials performing discretionary functions are protected from liability by qualified immunity.  *Leaf v. Shelnutt*, 400 F.3d 1070, 1079 (7th Cir. 2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987)).  Qualified immunity is broad and provides protection to "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475

U.S. 335, 341 (1986).  Qualified immunity leaves "'ample room for mistaken judgments' by police officers."  *Payne*, 337 F.3d at 776 (quoting *Malley*, 475 U.S. at 343).  It does not protect individual officers, however, if they (1) violate clearly established law (2) that a reasonable officer should know.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Considering whether a constitutional violation occurred, the court is to examine the facts in a light most favorable to the party asserting an injury and determine whether "the facts alleged show the officer's conduct violated a constitutional right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity" and immunity is proper.  *Id*.  Should a constitutional violation be found to have occurred, it must be shown that the unlawfulness of the officer's actions was "apparent" from pre-existing law.  *Anderson*, 483 U.S. at 640.  A violation is sufficiently apparent if it "would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 194-95 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1991)).

The City of East Chicago Defendants rest the bulk of their qualified immunity argument on their belief that Officer Rivera had probable cause to arrest Plaintiffs.  The Court, however, found that a genuine issue of material fact exists with regard to probable cause.  The City of East Chicago Defendants argue in the alternative that even if the Court does not find that probable cause existed as a matter of law, a reasonable officer could have mistakenly believed that there was probable cause.  Referred to as "arguable" probable cause, this basis for qualified immunity exists when "a reasonable police officer in the same circumstances and with the same knowledge . . . as the officer in question *could* have reasonably believed that probable cause existed in light of well-established

law." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (citations and quotations omitted). A court should award an officer summary judgment "if their actions were not objectively unreasonable at the time they were taken." *Id.* (citations and quotations omitted).

While the standard for "arguable" probable cause allows for more discretion on the part of an arresting officer, in this case the Court declines the City of East Chicago's request to adopt its version of the facts. Betty's and Raymond's testimony that they did not raise their voices and did not use curse words, if adopted, could lead a reasonable jury to find that their arrests were objectively unreasonable. If the jury adopts Plaintiffs' version of events, there would have been no cause to take them under arrest. Plaintiffs, under their version of events, adequately allege that a constitutional violation occurred due to their arrests without probable cause and advance beyond the first prong of the qualified immunity analysis. *See, e.g., Washington v. Haupert*, 481 F.3d 543, 547 (7th Cir. 2007) (citing *Thompson v. Wagner*, 319 F.3d 931, 934 (7th Cir. 2003) ("The Fourth Amendment permits warrantless arrests only if the arresting officer has probable cause to believe that a crime has been committed").

In addition, if Plaintiffs' version of events is adopted by the trier of fact, the rights violated are such that a reasonable officer should know of them. Seventh Circuit precedent is clear on this point that a police officer cannot make a warrantless arrest without probable cause. *See, e.g., id.* Plaintiffs thus satisfy both prongs of the analysis but wisely acknowledge that if the facts alleged by the City of East Chicago Defendants are adopted by the trier of fact and it is determined that "Ms. Crenshaw was unreasonably noisy, that she defied a direct order from an officer to either leave the premises, or to quiet down, and that she became belligerent, then there is no question that Officer Rivera had not only arguable probable cause, but indeed, had actual probable cause." Pls.' Resp.

32

Br. Summ. J. at 15-16. The Court denies the City of East Chicago Defendants' Motion for Summary Judgment on the issue of whether Officer Rivera is entitled to qualified immunity.

### D. Claims against Officers Zygmontowski and Blackwell and Lieutenant Snyder

The City of East Chicago Defendants argue that Plaintiffs do not sufficiently allege that the remaining Officers engaged in joint action with Officer Rivera such that claims under 42 U.S.C. § 1983 against the remaining Officers can survive summary judgment. The substance of the City of East Chicago Defendants' argument goes beyond the joint action issue and contends that Plaintiffs generally failed to adequately allege that any of the remaining Officers engaged in activity that violated Plaintiffs' civil rights. Plaintiffs respond to the joint action argument by asserting that the remaining Officers, based solely on information provided by Officer Rivera, assisted in the unlawful arrests and detention and collectively attempted to cover up their unlawful actions by propounding false charges against Plaintiffs. Plaintiffs contend that the remaining Officers are, along with Officer Rivera, equally culpable for the alleged wrongs.

*1. Joint action*

The City of East Chicago Defendants again rely on their conclusion that Officer Rivera acted with probable cause, and contend that because there was probable cause for Plaintiffs' arrests, liability based on a joint venture between Officer Rivera and the remaining Officers is barred by qualified immunity. Having found that a genuine issue of material fact exists as to whether Officer Rivera had probable cause to arrest Plaintiffs, the Court has herein denied summary judgment on that issue. The Court denies summary judgment on the City of East Chicago Defendants' theory of imputed qualified immunity. Thus, Plaintiffs' claim, as stated in their Complaint that the Officers "engaged in a joint venture for which they are equally culpable . . ." in "assisting each other in

33

performing the various acts [alleged] . . ." survives summary judgment, at least with respect to this joint action argument.  Compl. at ¶ 30.

Moreover, the Court finds that the issue of joint actorship is more appropriately applied to a scenario when a plaintiff seeks to hold a private actor liable under 42 U.S.C. § 1983.  *See* Section B Analysis of CFB's Mot. for Summ. J.*, supra*.  In *Morfin*, the plaintiff named multiple defendants, including a private individual, and sued for unlawful arrest.  *See* 349 F.3d at 1002.  The defendants in the case conceded that "a private individual could be held liable under Section 1983 upon a showing that the private individual and state actor(s) acted in concert or jointly in depriving a person of civil rights."  *Id*. at 1003.  The court found that based on the record, a reasonable juror could conclude that the defendants acted jointly in making the arrest.  *Id*. at 1003-04.  Here, the remaining Officers are state actors by the nature of their employment as City of East Chicago Police Officers.  As a result, joint action with a state actor need not be shown.

*2.  Allegations and supporting evidence for claims against remaining Officers*

Next, the City of East Chicago Defendants argue that Plaintiffs have not submitted sufficient evidence in support of their claims that the remaining Officers engaged in unlawful conduct.  Once again, the Court finds the analysis in *Morfin* helpful.  The plaintiff in *Morfin* named an officer who allegedly assisted in his arrest as a civil defendant.  However, in his pleadings, the plaintiff barely mentioned the assisting officer and failed to describe how his involvement in the arrest implicated him in the alleged constitutional violation.  As a result, the *Morfin* court found that the assisting officer, who according to the record was only involved in the incident because he transported the plaintiff from the site of arrest to the police department for booking, could not be held liable for the alleged constitutional violations.  *See* 349 F.3d at 1000-01.

The plaintiff in *Morfin* also named a supervising police chief as a defendant, and alleged that the chief knew that the defendant officers were violating the plaintiff's constitutional rights but failed to take any action to prevent the alleged acts. The court found that the plaintiff's allegations again fell short because he failed to submit any evidence establishing that the chief knew of any unconstitutional actions. *See id.* at 1002. The court held that the chief could have reasonably concluded that the officers had probable cause to arrest the plaintiff. *See id.* The court explained, "Speculation [as to what the chief may have known] is insufficient to withstand summary judgment." *Id.* (citations and quotations omitted).

In this case, Plaintiffs allege that all of the Defendant Officers participated in handcuffing Raymond. Plaintiffs further allege that Officers Zygmontowski and Blackwell, at the direction of Officer Rivera, transported Betty to the police station where she was booked and detained. Plaintiffs allege that Lieutenant Snyder approved the detention and arrest of Plaintiffs in an effort to conceal the wrongful acts and misconduct of his fellow officers. Plaintiffs also allege that all of the Officer Defendants failed to offer medical assistance. Finally, Plaintiffs allege that the Defendant Officers attempted to cover their alleged wrongful arrest and detainment by intentionally bringing false disorderly conduct charges.

### a.  Officers Zygmontowski and Blackwell

Plaintiffs submit the following evidence in support of their claims against Officers Zygmontowski and Blackwell. At deposition, Betty testified that a police officer, whom she did not identify by name and could only identify as being white, removed her from the bank and took her to a police car. Plaintiffs contend that this officer is not Officer Rivera. The City of East Chicago Defendants disagree. In their Statement of Material Facts as to Which There is No Genuine Issue,

the City of East Chicago Defendants identify Officer Rivera by name throughout the filing. However, when addressing the Officer who took Betty to a police car and drove her to the police station, the City of East Chicago Defendants identify him as a white officer, suggesting a different identity.

Betty recalled that the white police officer was not mean to her but that as he drove to the police station, Betty requested that he take her to the hospital and he ignored her request. Raymond testified at deposition that as Betty was led away from the bank, Officer Rivera instructed another officer to arrest Raymond. The other officer, whom Raymond did not identify, handcuffed Raymond, placed him inside a police car, took him to the police station, and placed him in a cell where he remained until Betty's sister bailed him out. Raymond testified that he did not suffer any physical injury at the hands of the officer. Raymond recalled that he witnessed a white officer escort Betty from the bank to a police car. According to Raymond, the officer did not drag Betty or do anything inappropriate. Nevertheless, Raymond testified that he suffered injuries from witnessing the police officers arrest and detain his wife.

A genuine issue of material fact persists as to Officers Zygmontowski's and Blackwell's involvement in the alleged constitutional violations. This is another instance of they said–Plaintiffs' arguing that Officers Zygmontowski and Blackwell were involved in the alleged unconstitutional violations, they said–the City of East Chicago Defendants' arguing that only Officer Rivera participated in the alleged unlawful acts. Neither side has conclusive evidence establishing involvement or a lack of involvement. As a result, the City of East Chicago Defendants' Motion for Summary Judgment as to the claims against Officers Zygmontowski and Blackwell is denied.

b.  Lieutenant Snyder

With regard to Lieutenant Snyder, Plaintiffs maintain that he approved their detention and arrests but do not produce any evidence in support of this theory.  Moreover, the circumstances surrounding the detention and arrest contradict Plaintiffs' theory.  Within the span of approximately ten minutes, Betty entered the bank and was detained and arrested.  Within those same ten minutes, Raymond entered the Bank, was asked to leave, and was then arrested.  The Court finds it unlikely that Officer Rivera was able, in those ten minutes, to contact Lieutenant Snyder and solicit his approval for Plaintiffs' arrests.  Further, Plaintiffs did not introduce any evidence that such a communication occurred, and without proof, their theory cannot withstand summary judgment.

Lieutenant Snyder cannot be held liable for constitutional violations merely due to his supervisory public role.  *See Morfin*, 349 F.3d at 1001.  Lieutenant Snyder, to be held liable, must have either approved, condoned, or turned a blind eye to the other Defendant Officers' unconstitutional actions.  *See id*.  If Lieutenant Snyder knew of facts that would cause him to believe that the Defendant Officers were about to violate Plaintiffs' constitutional rights and he failed to use his authority to stop the violation, that failure would give rise to liability under 42 U.S.C. § 1983.  *See id*.  However, the record consists solely of allegations by Plaintiffs in their Complaint and pleadings.  There is no evidence that Lieutenant Snyder knew of any alleged unconstitutional acts committed by the Defendant Officers.  Plaintiffs' allegations fall short of a colorable claim against Lieutenant Snyder.  The Court grants the City of East Chicago Defendants' Motion for Summary Judgment as to Plaintiffs' claims against Lieutenant Snyder.

### E.  Betty's medical treatment

The City of East Chicago Defendants argue that Betty received medical treatment within two hours of her arrest, and that the level of care she received does not constitute a constitutional violation.  Plaintiffs contend that after taking Betty into custody, the City of East Chicago Defendants violated her Eighth Amendment right to protection against cruel and unusual punishment.

The Eighth Amendment of the United States Constitution protects against cruel and unusual punishment.  *See* U.S. Const. amend. VIII.  A claim that a prison official has violated the Eighth Amendment, which is how Plaintiffs and the City of East Chicago Defendants frame their legal analysis of this issue in their briefing, must demonstrate the following two elements: "(1) an objectively serious medical condition, and (2) deliberate indifference by the prison officials to that condition."  *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (citing *Zentmyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000)).

Contrary to the parties' understanding, the Eighth Amendment deliberate indifference standard does not apply until a defendant is convicted.  *See Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  It is the Fourth Amendment's ban on unreasonable seizures that governs at the time of arrest.  *See id.*  "[T]he Fourth Amendment governs the period of confinement between arrest without a warrant and the preliminary hearing at which a determination of probable cause is made[.]"  *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992).  This correction benefits Plaintiffs as the deliberate indifference standard of the Eighth Amendment requires a plaintiff to make a higher showing than is necessary to bring a claim

38

under the objectively unreasonable standard of the Fourth Amendment. *See Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

The following four factors influence the analysis of a plaintiff's claim of inadequate medical care under the Fourth Amendment: (1) whether the officer had notice of the arrestee's medical need, either through words or observation;(2) the seriousness of the medical need, and whether complaints are accompanied by any physical symptoms; (3) the scope of the requested treatment, which is to be balanced against the second factor; and (4) police interests. *Id.* (citing *Sides*, 496 F.3d at 827-28; *compare Lopez v. City of Chi.*, 464 F.3d 711, 719 (7th Cir. 2006) (finding that the plaintiff's allegations that he was shackled to a wall of an interrogation room for four days and nights and deprived of food, drink, and sleep were sufficient to form objectively unreasonable conduct under the circumstances); *with Sides*, 496 F.3d at 828 (court found that plaintiff's allegations that he was forced to stand against arresting officers' car for about an hour, during which time his buttocks became sore and he became dizzy and dehydrated did not rise to the level of unreasonableness required to stake a Fourth Amendment claim).

Here, Plaintiffs contend that Officer Rivera kicked or otherwise struck Betty in the right leg, causing a serious injury that required medical attention.  Betty testified at deposition that she had a pre-existing knee injury for which she planned to undergo surgery a few days after the incident. Betty testified that Officer Rivera's kick worsened her existing injury.  Officer Rivera arrested Betty at 5:15 p.m. and Betty arrived at St. Catherine Hospital emergency room at 7:37 p.m.  Plaintiffs argue that by ignoring Betty's repeated requests for medical care, and failing to deliver her to a hospital for approximately two hours, the City of East Chicago Defendants acted with deliberate

indifference and violated her constitutional rights.  The court will examine Plaintiffs' contentions under the correct Fourth Amendment standard.

According to the record viewed in a light most favorable to Plaintiffs, the City of East Chicago Defendants were quickly aware of Betty's injury and her requests for medical attention. Betty testified at her deposition that when Officer Rivera brought her to the chair in the bank lobby and asked her to sit down, she told him that she could not because she had a bad leg.  Betty testified that following her arrest, she made three separate requests to be taken to a hospital.  She made one request on the way to the police station, one during booking, and the final request after she had been placed in a holding cell.  Betty testified that in one of her requests, she told officers that her leg hurt her "really bad."  City of East Chicago Defs.' Br. Summ. J., Ex. 1, at 13.  In addition, Raymond testified that he requested that officers take Betty to a hospital after he arrived at the police station.

Based on the evidence of record, several of the individual Defendants knew of Betty's requests for medical care and despite those requests did not allow her to receive any care for approximately two hours.  While two hours is a relatively short time to receive medical care for a non-life threatening leg injury,[7] the Court weighs several countervailing factors.  The circumstances of Betty's arrest were not such that the officers needed to delay attending to Betty's medical needs. The officers were not transporting a dangerous suspect or bringing her in for processing in a case that required immediate involvement of additional officers.  Instead, the Officers arrested Betty for a misdemeanor and were bringing her in for booking.  The Officers' direct knowledge of Betty's requests for medical attention and ignorance of those requests raises a genuine issue of material fact

---

[7]Medical records describe Betty's injury as a "post blunt injury" that resulted in "acute pain."  City of East Chicago Defs.' Br. Summ. J., Ex. 9, at 6, 11.  The records further provide that physicians instructed Betty to "wear knee immobilization for support & comfort" and physicians provided a "script . . . for pain meds."  *Id.*

as to whether the City of East Chicago Defendants' treatment of Betty during the two hours between arrest and arrival at the hospital was objectively reasonable under the Fourth Amendment. Additional evidence may come to light at trial relevant to the jury's consideration of whether the Officers acted in an objectively reasonable manner.  However, at this point the Court denies the City of East Chicago Defendants' Motion for Summary Judgment as to Betty's claim for unreasonable medical care.

### F.  Municipal liability

The City of East Chicago Defendants' final argument is that Plaintiffs failed to show that the City of East Chicago was sufficiently involved in the alleged unconstitutional acts to create municipal liability.  Plaintiffs contend that the City of East Chicago instituted a "hollow" training policy, which led to insufficient officer training, which now exposes the municipality to liability. Plaintiffs also contend that the City of East Chicago failed to adequately investigate citizen complaints of police misconduct and actually tolerated such acts.

To establish a claim under 42 U.S.C. § 1983 against the City of East Chicago, Plaintiffs must show that the municipality violated their constitutional rights in one of three ways: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.  *See Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (citing *Roach v. City of Evansville*, 111 F.3d 544, 548 (7th Cir. 1999)). To prevail, Plaintiffs must show that through deliberate conduct, the local government agency was

the "moving force" behind the alleged injury. *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 404 (1997).

In their allegations, Plaintiffs do not specify a single area of inadequate training, instead they argue that City of East Chicago police officers receive inadequate training in general. In *City of Canton v. Harris*, the Supreme Court held that a municipality's failure to train its police officers gives rise to liability only when the failure to train amounts to "'deliberate indifference' to the rights of persons with whom the police came into contact." 489 U.S. 378, 389 (1989); *see also Washington v. Village of Riverside, Ill.*, No. 01 C 7438, 2003 WL 1193347 (N.D. Ill. Mar. 13, 2003). "Occasional negligence in administration is not enough." *Bowden v. Town of Speedway*, 539 F. Supp. 2d 1092, 1107 (S.D. Ind. 2008) (citing *City of Canton*, 489 U.S. at 391). The Court in *City of Canton* reasoned that "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390. Along with deliberate indifference, the plaintiffs must demonstrate that the municipality had notice that the omission of training would likely result in a constitutional violation. *See Palmquist v. Slevik*, 111 F.3d 1332, 1344 (7th Cir. 1997); *Hirsch v. Burke*, 40 F.3d 900, 904 (7th Cir. 1994). In such an instance, the municipality may be liable for its failure to provide proper training. *See Canton*, 489 U.S. at 390.

Plaintiffs compare this case to *Bowden*. In *Bowden*, the plaintiff alleged that an arresting officer violated his rights due to inadequate training. The arresting officer had completed eight hours and twelve and a half hours of training respectively in the two years preceding the arrest. Both totals fell short of the Indiana state requirement of sixteen hours of annual training for police

42

officers.  The court determined that the officer's employing municipality placed the responsibility

of attending the proper amount of training on the individual officers themselves.  *See* 539 F. Supp.

2d at 1108.  The court therefore found that a reasonable jury could conclude that it was "foreseeable

to the town that such a hollow policy would result in these types of constitutional violations."  *Id.*

(citations omitted).

Here, Plaintiffs contend that the City of East Chicago had notice that it oversaw a deficient

training program because since 2005, it has been named as a defendant in a number of civil rights

lawsuits filed in the United States District Court for the Northern District of Indiana.  Plaintiffs

identify four separate lawsuits, each of which names the City of East Chicago as a defendant and

asserts a cause of action predicated on an alleged failure to train police officers in connection with

an incident of battery, excessive force, or false arrest.  These lawsuits, Plaintiffs argue, are evidence

of the City of East Chicago's deliberate indifference toward training its officers and toward civil

rights violations resulting from the officers' inadequate training.  Plaintiffs argue that the City of

East Chicago's training policy is hollow, similar to that of the municipal defendant in *Bowden*.

According to the City of East Chicago's Police Department Rules and Regulations, "A

commanding Officer shall constantly train his subordinates through example, precept, admonition,

correction, formal and informal instruction, seminars, conferences, field and staff problems and any

other suitable way."  ECPD Rules & Regulations, § 103.2(g).  Plaintiffs argue that pursuant to this

rule, the amount of training and subject of any training is left completely to the Commanding

Officer's discretion.  Plaintiffs contend that the discretion left to the Commanding Officer, combined

with the history of civil rights lawsuits filed against the City of East Chicago, demonstrate notice

and deliberate municipal indifference.

43

Arguing that their training regimen is sufficient, the City of East Chicago Defendants submitted the Affidavits of Officer Rivera and Michael Equiha.  Michael Equiha has been the Training Coordinator for the ECPD since 1998 and is the current Custodian of Records for the Department.  In his Affidavit, Mr. Equiha discusses the Department's training guidelines and in doing so paints a more complete picture of the training policies than that revealed by Plaintiffs' reference to a single statement in the Rules and Regulations:

> The[ECPD] requires all law enforcement officers to meet the state of Indiana statutory training requirements of sixteen (16) hours of continuing education per year . . .  Any officer who fails to meet the state minimum guidelines will be subjected to disciplinary actions which could lead to suspension and termination . . .

City of East Chicago Defs.' Reply Br. Summ. J., Ex. 2, at 3.  Acknowledging Plaintiffs' reference to the *Bowden* case, attached to Mr. Equiha's Affidavit is a copy of the continuing education records of Officer Rivera, which date back to his 1998 hiring.  The records reveal that Officer Rivera surpassed the sixteen hour training requirement every year.  According to the records, in several calendar years Officer Rivera completed well in excess of one hundred hours of training.  During his year of least training, a twenty-three hour effort, Officer Rivera managed to attend a program relevant to this matter addressing "Detention Procedures."  *Id*. at 4.

Officer Rivera, in his Affidavit, attests to the following:

> I graduated from the Indiana Law Enforcement Academy in December, 1998 meeting the requirements of the Indiana Law Enforcement Training Board pursuant to Indiana Code 5-2-1-1 and the Board's Administrative Rules. . . .  Since graduating from the Indiana Law Enforcement Academy I have completed field officer training[,] . . . I have continued my education in law enforcement studies taking as much as fifty hours per year in classes, seminars, lectures, and field training[, and] I have met and exceeded the state of Indiana mandatory requirement of sixteen hours of training almost every year since graduation from the Indiana Law Enforcement Agency.

City of East Chicago Defs.' Reply Br. Summ. J., Ex. 1, at 3. Officer Rivera's account of his training history differs from the information contained in the records submitted with Mr. Equiha's Affidavit. The records submitted by Mr. Equiha evidence that every year since becoming a police officer, Officer Rivera completed more than the required sixteen hours of training. Officer Rivera, however, in his Affidavit represents that he has completed more than the sixteen required hours "almost every year." *Id*. Yet Plaintiffs do not challenge this inconsistency and failed to submit any argument that Officer Rivera did not complete State mandated training. Instead, for supportive evidence, Plaintiffs rely entirely on the City of East Chicago's police and the other civil rights cases filed against the City of East Chicago in recent years.

Plaintiffs fail to advance a theory as to what areas or skills the City of East Chicago failed to train its police officers. Plaintiffs' theory of a general failure to train due to a number of recently filed civil rights lawsuits does not satisfy their burden to show that the City of East Chicago acted with deliberate indifference to the constitutional rights that Plaintiffs allege Defendants violated in this case. Plaintiffs cite the four lawsuits but do not contend that the City of East Chicago was found liable. Were the City of East Chicago to prevail in all four matters, the mere filing of the lawsuits would not establish that it had notice of training program shortcomings.

Plaintiffs' argument falls well short of what is required. *See Ross v. Town of Austin*, 343 F.3d 915, 918-19 (7th Cir. 2003) (finding that were the court to impose additional requirements on an officer who completed the state required hours of annual training, it could exceed its judicial authority). Unlike the situation in *Bowden*, Plaintiffs cannot hang their case on Officer Rivera's training. Uncontested records show that he completed the required number of annual training hours required by Indiana statute, and this Court cannot require that he do more. As to the other individual Defendants, Plaintiffs failed to introduce any evidence with regard to their training. According to

45

the City of East Chicago's training policy, which is applied to all officers, sixteen hours of annual training is required in accordance with the State of Indiana's policy. The City's training coordinator and records custodian attested that if officers violate the policy, they will be subjected to discipline. Thus, contrary to Plaintiffs' suggestion, the policy is not hollow.

With respect to Plaintiffs' theory that the City of East Chicago bears liability under 42 U.S.C. § 1983 because it failed to adequately investigate citizen complaints of police misconduct and actually tolerated misconduct, Plaintiffs' supporting evidence is paltry. Plaintiffs again refer the Court to the four federal lawsuits, in which the City of East Chicago is a named defendant to police misconduct charges. As described above, these citations do little to establish a policy of police misconduct. Without more in the way of evidence of a policy, custom, or practice, Plaintiffs' theory alone is insufficient to establish municipal liability under 42 U.S.C. § 1983. The Court grants the City of East Chicago Defendants' Motion for Summary Judgment as to Plaintiffs' claims under 42 U.S.C. § 1983 for municipal liability.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** the Defendant Citizens Financial Bank's Motion for Summary Judgment [DE 52], and Citizens Financial Bank is **TERMINATED** as a party to this litigation. The Court **GRANTS IN PART AND DENIES IN PART** the Defendants' City of East Chicago, Indiana, Officers Jose Rivera, James Blackwell, Jake Zygmontowski, and Lt. William Snyder, Individually and as Officers of the East Chicago, Indiana Police Department Motion for Summary Judgment [DE 58]. The Court **GRANTS** summary judgment as to all Plaintiffs' claims against Lt. Snyder; Plaintiffs' tort claims against Officers Zygmontowski and Blackwell; and Plaintiffs' claims under 42 U.S.C. § 1983 alleging municipal liability.

46

The following claims survive summary judgment: (1) Plaintiffs' claims in Count I under 42 U.S.C. § 1983 against Officers Rivera, Zygmontowski, and Blackwell; (2) Plaintiffs' claim in Count II for assault and battery against Officer Rivera; (3) Plaintiffs' claims in Count III for false arrest and illegal imprisonment against Officer Rivera; (4) Betty's claim in Count IV for intentional infliction of emotional distress against Officer Rivera; (5) Raymond's claim in Count V for intentional infliction of emotional distress against Officer Rivera; and (6) Raymond's claim in Count VI for loss of consortium against Officer Rivera.  In addition, the following issues survive summary judgment: (1) whether there was probable cause for Plaintiffs' arrests; (2) whether Officer Rivera is entitled to qualified immunity; and (3) whether the remaining City of East Chicago Defendants rendered adequate medical care to Betty.  This matter remains set for Final Pre-Trial Conference on **October 17, 2008**, and for Jury Trial on **November 10, 2008**.

SO ORDERED this 23rd day of June, 2008.

 s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:    All counsel of record

47